UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| vs. ) | CAUSE NUMBER 3:07-CR-45AS |
| ) | |
| MARK CARROLL DUKES (01), ) | |
| RICHARD OLGUIN (02), and ) | |
| JORGE PADILLA (03) ) | |

OPINION AND ORDER

This cause came before the court on December 18, 19, and 27, 2007 for hearing on the motion of Jorge Padilla to suppress evidence, a motion in which his co-defendants joined. Defendant Richard Olguin withdrew his motion at the outset of the hearing, so the hearing only addressed relief sought by Mr. Padilla and Mark Dukes. For the reasons that follow, the court denies both motions. The court denies Mr. Dukes's motion because he has no standing to challenge the search, and denies Mr. Padilla's motion because the combination of probable cause and exigent circumstances made the warrantless search reasonable.

FACTS

The events pertinent to the suppression motion occurred in the late evening hours of April 17, 2007, and in the hours following that midnight. Gary Bickel called the St. Joseph County Police 911 line at about 10:50 p.m. to report what he considered suspicious activity at a building directly across the street from him at 62515 U.S. 31 in South Bend, Indiana. Mr. Bickel said people were unloading a semi-truck into a barn behind a vacant house. He said that a few nights a

month, a semi-truck with Texas plates arrives at 62515 U.S. 31 and people unload things into a barn; other vehicles with Illinois license plates arrive at the property after the Texas semi-truck left, then leave after going to the barn. Mr. Bickel said the property was unoccupied, though a van was parked there regularly, and that whenever he saw anyone on the property during the day, the Texas semi would show up that evening.

     Mr. Bickel's call caught the dispatchers' attention because of a "BOLO" (for Be On the Look Out) local police had received the day before from the Texas DEA. The BOLO said that a red 1996 Freightliner with a particular Texas license plate pulling a refrigerated trailer with a particular license plate would be transporting cocaine, which would be concealed in a load of produce, to an unknown location. Because of the potential drug involvement, officer safety concerns led the dispatchers to direct the responding officers to call in, rather than use the radio, lest armed drug dealers had a scanner.

     Sgt. Paul Jonas, Cpl. Rebecca Childers, and Cpl. Joseph Szalay were sent to the residence to investigate the complaint. The officers knew of the BOLO and the potential that drug dealers were involved at the US 31 address, so they parked their police cars about half a mile away and walked. 62515 U.S. 31 covers several acres; the area contains residences, farmlands, and some businesses.

     The barn was located about 100' south of the residence, and about 150' west of the highway. No exterior lights were on; apart from a dim light in the house, the only light came from inside the barn. From the highway, the officers

2

could see a Freightliner semi-truck backed up to the barn. The truck was blue, rather than red. The truck had no exterior markings identifying it as a produce truck, but in the officers' experience it appeared to be a refrigerated unit and was of a type used to transport produce. The trailer doors reached the barn walls, but were opened to less than 180 degrees, so space existed between the end of the trailer and the barn door opening. Through the space beneath the trailer and tractor, the officers could see light, feet, and legs in the barn. The movements and sounds were consistent with people moving things around. The officers walked a bit up the driveway to check the license plate. The first 4 digits of the tractor's license plate matched the BOLO; the last 2 did not.

The officers, who still didn't know if the people in the barn were armed, decided to wait for additional officers to arrive before confronting the people in the barn. They retreated to a tree line on the property across the street, and Sgt. Jonas contacted the dispatch officers. While the officers were in the tree line, they heard a noise they believed was the Freightliner's engine starting. The officers took this to mean that the semi was about to leave. The officers had left their squad cars a half mile away. Faced with few options, the officers decided to enter the barn and conduct an investigatory stop of the semi-truck.

The officers approached the cab up the driveway, head on. When they got within 30' of the cab, they realized that whatever engine they heard was not the cab engine. Concerned that the truck people had been alerted to their presence, they continued with their approach. Sgt Jonas, armed with an assault rifle, went

3

around to the back of the trailer, while Cpls. Childers and Szalay went around the front. Cpl. Szalay carried a shotgun, Cpl. Childers her service revolver.

Richard Olguin walked into the path of Cpls. Szalay and Childers from the area in which the van was parked. The officers ordered Mr. Olguin to put his hands up, but he did not comply. Instead, he reached for his waist, where the officers knew persons often carry firearms. Cpl. Childers reached out and took Mr. Olguin to the ground by his arm, hands in front of him. Mr. Olguin continued reaching for his waistband despite loud orders to show his hands. The two officers handcuffed Mr. Olguin. Cpl. Szalay continued into the barn. Cpl. Childers followed after patting Mr. Olguin down and finding no weapons. As she passed the trailer, she saw that it was a refrigeration unit, consistent with the BOLO.

Sgt. Jonas ducked under the trailer's open door and, as he stood before the barn's open doorway, encountered Jorge Padilla Jr., in the barn. He identified himself and told Mr. Padilla to get down on the ground. Mr. Padilla did not do so immediately; instead, he grabbed the front of Sgt. Jonas' gun barrel and seemed to try to take it from Sgt. Jonas. Sgt. Jonas pushed Mr. Padilla to the floor, where Mr. Padilla was handcuffed. Cpl. Szalay handcuffed Mark Dukes, the third person seen in the barn.

Cpl. Childers conducted a protective sweep of the barn, to see if other people were there. None were, but the officers noticed a large number of what appeared to be grapefruit boxes on the barn floor and in the trailer. It appeared that the men had been unloading the grapefruit boxes from the trailer. Conspicuously

4

visible through openings in the tops of some of the boxes were shrink-wrapped plastic wrappings of a sort commonly used for controlled substances, but not commonly used for grapefruit.

Other officers from a variety of agencies arrived after the barn and its occupants were secured. A state search warrant was sought and, ultimately, obtained.[1] The search of the grapefruit boxes yielded about 970 pounds of marijuana in 94 shrink-wrapped packages, and a set of electronic scales.

Mr. Dukes, Mr. Padilla, and Mr. Olguin ultimately were indicted on charges of conspiracy to distribute, and possession with intent to distribute, more than 100 kilograms of marijuana. *See* 21 U.S.C. §§ 841(a)(1), 841(b), and 846.

## ANALYSIS

Mr. Padilla and Mr. Dukes contend that the officers violated their rights to be free from unreasonable search and seizure when they entered the barn that evening. The government disagrees, and also contends that neither Mr. Padilla nor Mr. Dukes have standing to challenge the constitutionality of the entry.

*Standing*

---

[1] St. Joseph Superior Court Judge Jane Woodward Miller, wife of the judge to whom this case is now assigned, issued the search warrant. All parties to this case agreed that the suppression motion does not require the court to reconsider her decision, and does not challenge the issuance of the warrant except insofar as the warrant was based on, and so itself became, fruit of the poisonous tree.

The government contends that Mr. Padilla and Mr. Dukes have no standing to contest the validity of the officers' conduct on the evening of April 19 because they had no reasonable expectation of privacy in the barn. A defendant cannot challenge a search on Fourth Amendment grounds unless his own Fourth Amendment rights were violated, United States v. Salvucci, 448 U.S. 83, 86-87 (1980), which turns on whether the defendant had a subjective and reasonable expectation of privacy in the area searched or the evidence seized. Minnesota v. Carter, 525 U.S. 83, 88-89 (1998); Rakas v. Illinois, 439 U.S. 128, 143-149 (1978). An expectation of privacy is reasonable if it is one that society recognizes as legitimate and reasonable. United States v. Amaral-Estrada, 2007 WL 4246129 at *5 (7th Cir. Dec. 5, 2007); United States v. Haywood, 324 F.3d 514, 516 (7th Cir. 2003). A defendant seeking to suppress evidence under the Fourth Amendment bears the burden of proving that he has standing. United States v. Meyer, 157 F.3d 1067, 1079 (7th Cir. 1998); United States v. Torres, 32 F.3d 225, 229-230 (7th Cir. 1994).

1.

Mr. Padilla has standing to challenge the police conduct. Mr. Padilla was paying rent on the property and had been doing so with the formal lessee's permission. Mr. Padilla kept a sofa, television, dishes, clothing, and a weight bench in the house, and a heater in the barn. He had keys to both the house and

the barn, and locked the buildings when he wasn't there. His broken down van was on the property.

The government presented evidence that is somewhat inconsistent with Mr. Padilla's expectation of privacy, but is not as strong as Mr. Padilla's evidence. The lease for the property was not in Mr. Padilla's name and it was not his driver's license that appears in the landlord's records. But Mr. Padilla does not claim to have been the original lessee, and standing turns on privacy expectations, not legal rights. That the utilities were never transferred from the original lessee's name is not inconsistent with Mr. Padilla's de facto subletting of the property. One of the couple that leased the property didn't recognize Mr. Padilla's name or photograph, but Mr. Padilla says he paid his rent to the other member of the couple, who had a nearby office.

On at least two occasions — once when he was arrested in 2006 and again when he purchased a truck locally in 2007 — Mr. Padilla gave an address in Galveston, Texas. The court is not prepared to hold that society doesn't recognize the reasonableness of an expectation of privacy in a second place, where the person stays with some regularity but doesn't regularly receive mail.

Mr. Padilla has demonstrated that he had a subjective and reasonable expectation of privacy in the barn. He has standing to proceed on his suppression motion.

2.

Mr. Dukes had no such subjective and reasonable expectation of privacy in the barn. He notes that he was identified at the suppression hearing as the driver of Mr. Padilla's semi-tractor/trailer, and that the government alleges that he and Mr. Padilla were conspirators. Thus, it can be inferred that Mr. Padilla invited him into the barn. Mr. Dukes appears to claim entitlement to a derivative expectation of privacy.

The law does not support Mr. Dukes's theory of standing. The seminal case in Fourth Amendment standing law, Rakas v. Illinois, 439 U.S. 128, teaches that welcome presence in someone else's property doesn't confer standing, even if the other person has a reasonable expectation of privacy. Rakas held that passengers in an automobile had no standing simply by virtue of being on the premises; the passengers needed their own expectation of privacy for Fourth Amendment protection. Accepting Mr. Dukes's reasoning would require this court to ignore Rakas and effectively grant standing to anyone in an automobile other than stowaways and carjackers.

Mr. Dukes has no standing to challenge the search of the barn, so his motion to suppress must be denied.

*Constitutionality of Warrantless Entry*

Mr. Padilla argues that the officers' warrantless entry into the barn constituted an unreasonable search prohibited by the Fourth Amendment, and seeks suppression of all evidence obtained as a result of that search. The

8

government argues that exigent circumstances justified the officers' actions. The court agrees with the government.[2]

"In general, police need a warrant to enter a home or room but warrantless searches are permissible when police have a reasonable belief that exigent circumstances require immediate action and there is no time to obtain a warrant." United States v. Kempf, 400 F.3d 501, 503 (7th Cir. 2005). "Exigent circumstances exist if a officer had an objectively 'reasonable belief that there was a compelling need to act and no time to obtain a warrant.' ... The question as to whether exigent circumstances exist is viewed through the eyes of a reasonable police officer."United States v. Bell, 500 F.3d 609, 613 (7th Cir. 2007). The police need only have an objectively reasonable belief that exigent circumstances exist, Brigham City v. Stuart, 126 S.Ct. 1943, 1948-1949 (2006), but whether the exigent circumstances justify entry into a structure depends on the nature of the exigent circumstances and the nature of the structure. *See generally* Welsh v. Wisconsin, 466 U.S. 740, 753 (1984).

1.

Exigent circumstances confronted Sgt. Jonas, Cpl. Childers, and Cpl. Szalay on the evening of April 17. When they began their second approach toward the

---

[2] This argument differs from what the government set forth in its initial brief, when the government sought to defend the police conduct that evening as an investigatory stop under Terry v. Ohio, 392 U.S. 1, 21 (1968). The government didn't present a Terry argument at the suppression hearing, so the court needn't evaluate whether an entry into a building amounts to an investigatory stop.

9

truck, the sound of the engine had given them reason to believe the semi-tractor/trailer was about to leave. They had no ability to stop the semi. They could not barricade the driveway because they had left their squad cars a half mile away. They had radioed for additional units, but didn't know whether any units were in the area to stop the semi. Of course, they also didn't know what direction the semi would take, or how its direction might correspond to the location of any responding units. If the semi left immediately after starting its engine, the officers were in clear view.

Within ten yards of the tractor, the officers realized that the tractor's engine hadn't started, so the semi's departure (and the suspected contraband's departure) was not imminent. At that point, though, the officers had moved to within two or three truck lengths of a barn that might well contain armed men actively engaged in the drug trade, and the officers were concerned that those persons might have detected the officers' presence. A return to the tree line across the street at the end of the driveway would have made the officers sitting ducks for armed persons in the barn.

Caution is appropriate when a warrantless search is justified by exigent circumstances of law enforcement officers' own making, *see, e.g.,* United States v. Paul, 808 F.2d 645, 647-648 (7th Cir. 1986), but this was not such a situation. The circumstances arose from the starting of an engine, requiring a response from the officers. Fourth Amendment analysis focuses on the officers' honest beliefs rather than whether those beliefs turn out to be true, United States v. Amaral-

10

Estrada, 2007 WL 4246129 at *6 (7th Cir. 2007), and the officers had acted reasonably based on their honest beliefs. The concern that they had exposed themselves to serious harm by having done so racheted up the exigency even while changing it. That exigency justified the officers in continuing toward the barn.

As they did so, Mr. Olguin surprised them (and, it would seem, they surprised him as well). Mr. Olguin ignored orders to show his hands and went instead for his waist, an area in which weapons often are kept. Perhaps, as was suggested at the suppression hearing, Mr. Olguin's disobedience flowed from a language barrier, but law enforcement officers cannot be expected to stop a course of conduct triggered by the risk that they had been detected to explore the linguistic range of a person who appeared to pose a mortal threat to the officers. The officers did not testify at the hearing as to whether Mr. Olguin's appearance and actions heightened the exigency in their eyes, but the Olguin confrontation could not have abated the exigency.

The officers reasonably believed that exigent circumstances existed at the time of, and justified, their entry into the barn. They had reason to believe that the persons inside were large-scale cocaine smugglers, likely armed, and likely aware of the officers' immediate presence. In response to that exigency, they entered a barn, not a house.

2.

Although the case law occasionally omits discussion of the point, exigent circumstances alone do not justify entry into another's structure: probable cause for a search is required, as well. *See* Leaf v. Shelnutt, 400 F.3d 1070, 1081 n.10 (7th Cir. 2005) ("The district court did not address whether probable cause existed to justify the officers' entry. The cases on which the district court primarily relied in its analysis of exigent circumstances do not address the requirement of probable cause separately from the existence of exigent circumstances. However, other cases of this court do apply the requirement of probable cause even in exigent circumstances. Circumstances constituting probable cause may include the reasonable belief 'that illegal activity is being conducted in a particular place.'") (citations omitted). The government contends that probable cause existed to search the barn; Mr. Padilla disagrees.

Probable cause exists when "the known facts and circumstances are sufficient for a reasonably prudent person to form the belief that contraband or evidence of a crime will be found." United States v. Lake, 500 F.3d 629, 632 (7th Cir. 2007). When the officers entered the barn, they knew, or had reason to believe, the following:

> 1. An identified citizen had provided information that the officers had corroborated in substantial part. Information from an identified citizen is considered more reliable than an anonymous tipster, for purposes of Fourth Amendment analysis. Edwards v. Cabrera, 58 F.3d 290, 294 (7th Cir. 1995) (*quoting* United States v. Towns, 913 F.2d 434, 441 (7th Cir. 1990)); accord,

12

as to 911 calls, United States v. Drake, 456 F.3d 771, 775 (7th Cir. 2006). That Mr. Bickel identified himself in recorded calls to 911 makes the reasoning of United States v. Lee, 300 F. Supp. 2d 632 (N.D. Ill. 2004), upon which Mr. Padilla relies, inapplicable.

    2. A tractor/trailer with Texas plates was located on the property. They had received a BOLO only the day before about a tractor/trailer with Texas plates carrying a load of cocaine.

    3. The BOLO had referenced a Freightliner. The vehicle on the property was a Freightliner. That the BOLO had referenced a unit of a different color weighs against a finding of probable cause, but is simply a single factor.

    4. The BOLO reported that the trailer would be a refrigeration unit. At first, the officers could not tell with certainty whether they were looking at a refrigeration unit, but they could tell the rig was similar to the type used for refrigeration. As Cpl. Childers passed the unit, she could see it was a refrigeration trailer, but the evidence doesn't allow a finding whether that discovery preceded the other officers' entry into the barn.

    5. The BOLO specified the tractor's license plate number. The first four digits of the plate on the tractor in the driveway matched. The last two digits did not match.[3]

---

[3] The court does not understand the suppression motion to address the officers' walking up the driveway, onto the property, to examine the license number. In any event, the officers had sufficient reasonable suspicion at that point to enter onto private property open to delivery

  6. The vehicle was similar to one that reportedly arrived at this address at night once or twice a month, staying only long enough to unload, and then left.

  7. The vehicle appeared to be in the process of being unloaded.

  8. In the past, once the truck was unloaded, two or three trucks with Illinois plates would appear briefly the next day.

  9. The area was mixed use — residential, agricultural, business — but the buildings at which the semi was being unloaded did not appear to be a business.

  10. All of this was occurring late in the evening, consistent with previous visits.

  11. The property was unoccupied. This turned out to be only partly true, since Mr. Padilla stayed there occasionally, but the information had come from a well-corroborated known source.

  12. At least one person in the area had refused to comply with police orders.

These facts do not amount to proof beyond a reasonable doubt, and as Mr. Padilla points out, innocent explanations might exist for each. But the existence of alternative inferences doesn't defeat the existence of probable cause, United States v. Watzman, 486 F.3d 1004, 1008 (7th Cir. 2007), which consists simply

---

people but not within the curtilage of the home. United States v. LaPage, 477 F.3d 485, 488 (7th Cir. 2007); United States v. French, 291 F.3d 945, 951-954 (7th Cir. 2002).

of a probability — a substantial chance that criminal activity is occurring — not a certainty. Mannoia v. Farrow, 476 F.3d 453, 457 (7th Cir. 2007), *quoting* Beauchamp v. City of Noblesville, 320 F.3d 733, 743 (7th Cir. 2003). These facts present a substantial chance that criminal activity was occurring, and so constituted probable cause to search. The combination of probable cause and exigent circumstances forgives the warrant requirement.

It is more likely than not that still other facts were known before the officers entered the barn. When Sgt. Jonas passed under the trailer door, he was not yet in the barn. At that point, the grapefruit boxes were in plain view, and the BOLO had said the drugs were concealed in a load of produce. The evidence is not entirely clear where Sgt. Jonas stood in relation to the barn's doorway when he emerged from beneath the trailer door, but as the court understands the configuration, it seems slightly more likely than not that he would not yet have entered the barn. The margin of probability is so thin that the court would have hesitated had this been the event that tipped the probable cause balance in the government's favor. But when the court examines the issue free of the risk that it is determinative, it is more likely that Sgt. Jonas was still outside the barn than that he somehow entered the barn simultaneously with coming up from under the trailer door.

3.

Two additional points must be addressed. In closing argument at the suppression hearing, the government argued that the inevitable discovery doctrine also supports the officers' search. Under the inevitable discovery doctrine, the exclusionary rule doesn't apply if the government establishes by a preponderance of the evidence that the evidence ultimately and inevitably would have been discovered by legal means. Nix v. Williams, 467 U.S. 431, 444 (1984); United States v. Blackwell, 416 F.3d 631, 633 (7th Cir. 2005); cf. United States v. Johnson, 380 F.3d 1013 (7th Cir. 2004). That doctrine doesn't help the government if the preceding finding of probable cause is wrong, because the government must prove that it had probable cause to invoke the inevitable discovery doctrine. United States v. Johnson, 495 F.3d 536, 543 (7th Cir. 2007). The doctrine comes into play only if the court's finding on exigent circumstances is wrong.

The government's inevitable discovery argument is insufficiently developed to allow the court to find that the government has carried its burden of proof under this doctrine. Given the uncertainties about the whereabouts of other police units and the stage of the unloading of the "grapefruit," there simply appears no logical path for the court to follow that it is more likely than not that the officers inevitably would have discovered the marijuana without acting when they did. The court remains persuaded that exigent circumstances supported the officers' actions.

In final argument, the government asked what else the officers could have done when confronted by the evening's circumstances. Mr. Padilla responded that the officers could have conducted a "knock and talk," which the court understands to mean the practice of a police officer knocking at a closed door to speak with an occupant, perhaps in hopes of obtaining consent to search the area behind the closed door. *See, e.g.,* United States v. Adeyeye, 359 F.3d 457 (7th Cir. 2004); United States v. Jones, 239 F.3d 716, 720-721 (5th Cir. 2001). This case, however, did not involve a closed door. It involved first, concerns for officer safety given the likelihood of guns being with the potential drug dealers, and second, a wide open door partially blocked by trailer doors. To knock on the barn wall adjacent to the open door, the officers would have had to place themselves precisely where Sgt. Jonas actually stood after scooting under the trailer door. Thus, had the officers conducted a "knock and announce," the produce boxes — in which the wrapped drugs could be seen — would have been in plain view, and the officers could have secured the barn and the people in it. Hadley v. Williams, 368 F.3d 747, 750 (7th Cir. 2004).

That observation is not an application of the inevitable discovery doctrine; it speculates on what might have resulted from earlier, not later, action. But it underscores the reasonableness of the officers' conduct that night.

Second, Mr. Padilla, though challenging the officers' entry into the barn, also argued that his arrest at the point of an assault rifle was unlawful. Throughout the suppression hearing, the government's witnesses denied having

17

arrested the three men from Texas immediately upon entry, explaining that the arrests didn't occur until hours later, after the plastic bags were inspected pursuant to the search warrant. No evidence was introduced to explain why an investigatory detention of several hours' length was reasonable, so the court accepts Mr. Padilla's position that he was arrested — for Fourth Amendment purposes, if not formally — shortly after the officers entered the barn.

The arrest was not unlawful. First, in light of the regularity with which persons in the illegal drug business are found to be armed, the brandishing of firearms has been held to be consistent even with a less-intrusive investigatory stop. United States v. Askew, 403 F.3d 496, 508 (7th Cir. 2005); United States v. Tilmon, 19 F.3d 1221, 1227 (7th Cir. 1994). Second, as already explained, when the officers entered the barn, they had probable cause to believe a crime was being committed. Once they got into the barn, they had probable cause to believe the three men on the premises were the people committing that crime, justifying the arrests. *See* Washington v. Haupert, 481 F.3d 543, 547 (7th Cir. 2007). The arrests were lawful.

CONCLUSION

For the foregoing reasons, the court DENIES the motions of defendants Padilla (docket entry #45) and Dukes (docket entry #48) to suppress.

SO ORDERED.

ENTERED:      January 3, 2008

      /s/ Robert L. Miller, Jr.
Chief Judge
United States District Court